Thomas G. Hood *et al.*, Partners as Hood, Bonbright, & Co.

*vs.*

Charles B. Jones, Edmund L. F. Hardcastle, Trustee of Araminta Jones, Araminta Jones, and Charles Williams, Sheriff.

New Castle, Sept. T. 1875.

*Husband and wife; conveyances by husband to wife; separate estate; rights of creditors of husband.*

1. A voluntary conveyance of all or a greater part of his property in favor of a wife, by a husband, who immediately or soon after the execution of the conveyance contracts debts on credit, is void as against subsequent creditors.

2. A conveyance to a wife, in consideration of love and affection, of all or the greater part of his property, by a husband, who immediately or soon after the execution of the conveyance contracts debts on credit, is void as against subsequent creditors.

3. A voluntary bond, or a bond the consideration of which is love and affection, executed in favor of a wife by a husband, who immediately or soon after the execution of such bond contracts debts on credit, is void as against subsequent creditors.

4. The receipt and appropriation by a husband of money constituting the separate estate of his wife, with her knowledge and acquiescence, does not establish the relation of debtor and creditor between them, and entitle the wife to compensation out of the husband's assets, unless at the time of such receipt it was understood between them that he should repay the money so received and appropriated.

5. In such case the law will not presume a promise by the husband to repay the money so received and appropriated.

6. A husband in some cases may be the agent of his wife, and a wife may be the agent of her husband.

7. When a husband receives the separate money of his wife, as her agent, and applies it to his own individual use, it will not be presumed to be a gift to him by the wife.

8. When a husband and wife execute a mortgage of her separate estate to pay the debt of the husband, or for his individual benefit, and the money is applied for his benefit, and not hers, and the mortgage is paid out of her separate estate, the wife thereby becomes the creditor of the husband to the extent of such payment, and has, as against him, all the rights of a surety.

9. A bond executed by a husband to a trustee for the benefit of his wife, the consideration of which is money paid from the mortgage of her separate estate, which mortgage was executed to pay the debt of the husband or for his individual benefit, is not void as against subsequent creditors.

10. The payment, out of a wife's separate estate, of a mortgage, executed by husband and wife, of such separate estate, will be in equity a sufficient consideration, as against creditors, for a bond executed by the husband to a trustee in favor of his wife.

CREDITORS' BILL.—On the 11th day of April, 1865, Herman Van Kapff, trustee, and Elizabeth Smith, conveyed to Richard J. Lockwood, trustee of Araminta Jones, wife of Charles B. Jones, for and in consideration of the sum of $6,000, a lot of ground, house, and premises situate in the city of Baltimore.

The sum of $4,500, part of the purchase money as stated by the deed, was paid by said Lockwood, trustee for Mrs. Jones, out of her separate property and estate, and the balance of the purchase money, being the sum of $1,500, by agreement of the parties, remained as an investment, secured upon the property as a redeemable ground rent.

By the terms of the deed, Lockwood, his executors, administrators, and assigns, were to have and to hold said property in trust for the sole and separate use and benefit of Araminta Jones, wife of Charles B. Jones, of the city of Baltimore, free and clear of and from the power and control of her husband, and without being subject to or bound for his debts, contracts, or engagements, and in all respects as if she were a *feme sole*, with power to her to sell or otherwise dispose of and convey the same in whole or in part by deed or will notwithstanding her coverture, and with power to said trustee, with the consent of said Araminta Jones, to sell or otherwise dispose thereof, to change the investment of the proceeds thereof, as often as in his discretion he may think proper, and to reinvest the same upon the same trusts as are set forth in said deed.

Jones and wife (Richard J. Lockwood being then dead) on the 19th day of April, 1871, executed a mortgage of these premises to John Todhunter, of the city of Baltimore. The mortgage deed recites as follows: "Whereas John Todhunter, of the city of Baltimore, has loaned unto the said Charles B. Jones and Araminta Jones the sum of $2,300, for which the said Charles B. Jones and Araminta Jones have passed and delivered unto the said John Todhunter a promissory note of even date herewith, drawn by the said Charles B. Jones and Araminta Jones, for the sum of $2,300, and payable to the order of the said John Todhunter one year after the date thereof; and for the legal interest thereon, payable in the mean time half-yearly, the said Charles B. Jones and Araminta Jones have passed and delivered unto the said John Todhunter two promissory notes dated and drawn as aforesaid for $69, each payable semi-annually in succession from this time, and, in order to secure the payment of the said promis-

sory notes as they shall respectively arrive at maturity, this instrument is executed, the execution hereof being a condition precedent to the making of the aforesaid loan,—now this mortgage witnesseth," etc.

The mortgage provides that in case of any default being made of any condition of the mortgage, then the whole mortgage debt thereby intended to be secured shall be deemed due and demandable, and that sale of said mortgaged premises may be made by the said John Todhunter. In the mortgage Jones and wife declared their assent to the passing of a decree for a sale of the mortgaged property according to the provisions of the laws of Maryland referred to in the mortgage.

A check was drawn in favor of Mrs. Jones, the same day the mortgage was executed, for the sum of $2,147.30, being the balance of the loan after deducting the cost and charges of the attorney for negotiating it. This check was indorsed by Mrs. Jones and her husband, and was paid to him. On the 22d day of March, 1872, Jones and wife sold and conveyed the premises to Charles R. Colladay, of the city of Baltimore, for the sum of $4,000.

The amount due on the mortgage to Todhunter was paid out of the proceeds of this sale, and a check for the balance, being the sum of $1,375.28, dated April 4, 1872, was drawn payable to C. B. Jones for account of Mrs. Araminta Jones. This check was indorsed by Charles B. Jones as follows: "C. B. Jones, Agent for Mrs. A. Jones,"—and was paid to him.

On the 19th day of June, 1872, Jones made and executed a bond for the sum of $4,000 in favor of Edmund L. F. Hardcastle, trustee for Araminta Jones.

About three months after the execution of said bond, Jones, who was then engaged in the business of selling goods, wares, and merchandise in Dover, commenced to purchase goods, and did thereafter, during a part of the years 1872 and 1873, purchase goods, wares, and merchandise, on credit, of the complainants, to a considerable amount, for which they instituted suit and recovered judgment against him at the

April Term, 1873, of the Superior Court in and for Sussex County. The date of this judgment is the 19th day of April, 1873. On the same day a *testatum fieri facias* was issued on said judgment, and was afterwards delivered to the sheriff of Kent County to be executed. On the 12th day of April, 1873, a judgment was confessed in the Superior Court in and for Kent County, in favor of Edmund L. F. Hardcastle, trustee, etc., in pursuance of the warrant of attorney contained in said bond, for the real debt of $4,000, with interest from the date of the bond. Execution was issued on said judgment the same day, and was delivered to the sheriff of Kent County, who thereunder seized the goods and chattels of Jones, and subsequently sold the same at public vendue for the sum of $2,183.20, which sum, less $301.58 applied to rent, is now in the hands of the sheriff, the right to which is the subject of controversy in this cause.

The complainants charge that the execution of the bond by Jones to Hardcastle, trustee for Mrs. Jones, the confession of judgment thereon, and the execution issued on said judgment, were for the purpose of preventing the *bona fide* creditors of Jones from realizing their claims by execution process; and that Jones was not indebted to Hardcastle, trustee of Araminta Jones, in the sum of $4,000 at the time of the execution of the bond to him, or at the time of the confession of judgment thereon.

They also charge that there was a fraudulent combination and confederacy between Hardcastle, Mrs. Jones, and Charles B. Jones, by means of the bond, judgment, and execution in favor of Hardcastle, trustee as aforesaid, to absorb all the proceeds of the sale of the goods and chattels of Jones, and prevent the application of any part thereof to their execution.

The defendants, in their answer, deny the fraudulent combination and confederacy with which they are charged in the bill, and state that the bond executed by Jones to Hardcastle, trustee for Mrs. Jones, was for a *bona fide* debt due and owing by Jones to Hardcastle, trustee of Araminta Jones. They state the purchase by Lockwood, trustee of Mrs. Jones, of the

5 DEL. CH.        6

house and premises in Baltimore, the mortgage of the same to Todhunter, its subsequent sale by them to Colladay, and that the sums of money realized by said mortgage and sale, after deducting from the purchase money of the sale what was then due upon the mortgage to Todhunter, were paid and advanced to Charles B. Jones for his own personal use, benefit, and advantage; and that by reason of said advancements made to the said Charles B. Jones for his own use, benefit, and advantage, said Charles B. Jones became indebted to the said Edmund L. F. Hardcastle, trustee of Araminta Jones, in the full sum of $4,000; and that the said bond executed by the said Jones was given to secure the money so advanced and paid to him out of the separate property of said Araminta Jones, and was for a *bona fide* debt due and owing from him to said Edmund L. F. Hardcastle, trustee for Araminta Jones, and is still due and owing to said trustee; that the bond was made on the day of its date and was immediately given to the counsel of Hardcastle, by whom it was delivered to Hardcastle on the 28th day of June, 1872. They say that at the time of the execution of the bond Jones was not indebted to the complainants, and that the firm of Hood, Bonbright, & Co. was then unknown to him.

*Benjamin Nields*, for the complainants:

The appropriation, by the husband, of the wife's separate estate, with her knowledge and consent, will not constitute a good consideration unless there is an agreement, at the time it is received, to repay the money so appropriated. *Kuhn* v. *Stansfield*, 28 Md. 210; *Blow* v. *Maynard*, 2 Leigh, 29; *Hill* v. *Hill*, 38 Md. 183; *Phillips* v. *Frye*, 14 Allen, 36.

The bond therefore cannot be enforced, for the reasons:

1. It was executed without any consideration, in law or equity; Jones received no money or property from Hardcastle; neither Hardcastle nor Araminta Jones had any claim against Jones which could have been enforced in equity; at the time the bond was executed he was not indebted to them or either of them in any manner whatever. It is therefore

clearly a voluntary executory contract without consideration. Equity will not enforce a voluntary executory contract. *Phillips* v. *Frye*, 14 Allen, 36; *Jefferys* v. *Jefferys*, 1 Craig & P. 138; *Holloway* v. *Headington*, 8 Sim. 325; Story, Eq. §§ 787, 793, 79½. The consideration of natural love and affection is not a consideration sufficient to support an executory contract and give it validity either at law or in equity. Kent, Com. 466. The husband appropriated the money received by him, with the wife's concurrence, knowledge, and consent, without any agreement or promise that it should ever be repaid to her; it was appropriated, in the words of the defendant's answer, for his own personal use, benefit, and advantage. Whatever separate estate or claim the wife may have had in or to the fund before it was so appropriated ceased from the time it was appropriated by her husband, as stated in defendant's answer.

2. There are no trusts declared; there are no uses or trusts which Hardcastle could execute, or be required in equity to execute, excepting to pay the money over to Mrs. Jones when received by him. The bond is simply a covenant on the part of Charles B. Jones to pay to Hardcastle $4,000, which, when paid, Hardcastle would be bound to pay over at once to Mrs. Jones. If the money therefore had been paid to Hardcastle (no uses having been declared), it would have been liable in his hands for the payment of Charles B. Jones's debts. Courts of equity carry trusts into effect only when they are of a certain and definite character. 2 Story, Eq. § 979 *a.*

A person about to engage in business which he believes may involve losses cannot, with a view to entering on such business, convey his property to his wife voluntarily, without consideration, to secure it for the benefit of himself and family in the event such losses should accrue. Such a conveyance is fraudulent and void as to subsequent creditors. *Case* v. *Phelps*, 39 N. Y. 164.

When a voluntary conveyance is made by an individual free from debt, with a purpose of committing a fraud on future creditors, it is void under the statute. *Parish* v.

*Murphree*, 54 U. S. 13 How. 99 (14 L. ed. 67); *Taylor* v. *Jones*, 2 Atk. 601; *Stileman* v. *Ashdown*, Id. 481.

The execution and delivery of the bond was a secret arrangement between Jones and his wife and Hardcastle; it was not entered when Jones obtained the goods and property of complainants, nor until after several suits had been commenced against Jones by his creditors, nor until seven days before complainants obtained their judgment. The fact that the bond was kept secret amounted to an actual fraud on the creditors. *Clow* v. *Woods*, 5 Serg. & R. 275; *Coates* v. *Gerlach*, 44 Pa. 43.

That the forms of law have been preserved is no protection in a court of equity, if the result aimed at and reached is a fraud. *Metropolitan Bank* v. *Durant*, 7 C. E. Green, 35.

*Charles H. B. Day*, for the defendants:

Fraud is not to be presumed, but must be established by proof. Circumstances of mere suspicion, leading to no certain results, will not be a sufficient ground to establish fraud. 1 Story, Eq. § 19; *Fooks* v. *Waples*, 1 Harrington, 131; *Grover* v. *Grover*, 3 Md. Ch. 29.

Fraud is of two kinds,—fraud intentional, or actual fraud; fraud in effect, or constructive fraud. There is no proof in this case of intentional or actual fraud. Legal or constructive fraud cannot be presumed, but must be established from facts and circumstances. It is the legal deduction drawn from all the facts and circumstances of a case where moral turpitude is wanting. Jones was not indebted at the time of making and delivering the bond to Hardcastle. The complainants were unknown to him at that time. He did not become indebted to them until nearly three months thereafter. Only such voluntary conveyances as are fraudulent in their inception are held to be void. Story, Eq. § 353. Subsequent creditors are not entitled to relief in a court of equity. Story, Eq. § 355. Where a man is not indebted at the time, he may make a voluntary conveyance, and it is good against subsequent creditors unless there is a meditated design of fraud

at the time of the conveyance. Story, Eq. §§ 356, 357. A voluntary conveyance cannot be considered fraudulent except as to existing creditors. Story, Eq. §§ 360, 361. A voluntary conveyance by a person not indebted at the time, in favor of his wife or children, cannot be impeached by subsequent creditors upon the ground of its being voluntary. It must be shown to have been fraudulent, or made with a view to future debts. Story, Eq. §§ 362, 363; 1 Madd. Ch. *274; *Verplank v. Sterry*, 12 Johns. 535; *Atkinson* v. *Phillips*, 1 Md. Ch. 507; *Bullett* v. *Worthington*, 3 Md. Ch. 99; *Williams* v. *Banks*, 11 Md. 198; *Morsell* v. *Baden*, 22 Md. 391; *Niller* v. *Johnson*, 27 Md. 6.

A married woman, by the laws of Maryland, is entitled to her real and personal property without being liable for the debts of her husband. Md. Laws 1853, chap. 245, p. 323; 1 Md. Code, art. 45, p. 325.

A wife may become the creditor of her husband, and, *vice versa*, the husband may become the creditor of his wife, by agreement, and equity will enforce it. *Livingston* v. *Livingston*, 2 Johns. Ch. 537; *State* v. *Reigart*, 1 Gill, 1; *Bowie* v. *Stonestreet*, 6 Md. 418; *Stocket* v. *Holliday*, 9 Md. 480; *Jones* v. *Jones*, 18 Md. 464; *Mayfield* v. *Kilgour*, 31 Md. 240.

The defendants are not bound to show that there was any special agreement by Jones to repay the money. The legal presumption is that the bond was given in pursuance of an agreement to repay, unless the contrary is shown. A wife becomes the creditor of her husband as surety, and is entitled to all the rights of a surety by pledging her property for his benefit. Whenever the wife mortgages her estate of inheritance or separate property for the payment of her husband's debts, or for his benefit and advantage, the husband joining in the mortgage, she is but a surety for her husband; and if she has to pay the debt, either by the sale of her property or in any other manner, by reason of such payment she becomes a creditor of her husband as surety, and is entitled to all the rights of a surety. The husband, joining in the mortgage, agrees to pay the money by the covenant in the mortgage

and by the bond or note to which the mortgage is collateral. Clancy, Mar. Wom. 1st Am. ed. from London 3d ed. chap. 12, p. 589; 1 Roper, Hus. & W. p. 140; Story, Eq. §§ 1372, 1373; *Parteriche* v. *Powlet*, 2 Atk. 383; *Neimcewicz* v. *Gahn*, 3 Paige, 614; *Johns* v. *Reardon*, 11 Md. 465; *Sheidle* v. *Weishlee*, 16 Pa. 134; *Pocock* v. *Lee*, 2 Vern. Ch. 604; *Tate* v. *Austin*, Id. 689; *Lewis* v. *Nangle*, 1 Cox, Ch. 240.

A married woman cannot contract a debt or charge her separate property except by a special agreement to charge it, unless the money is for her separate business or benefit, or for the benefit of her separate estate. The giving a bond or note for the payment of money for the debt of another, or for the benefit and advantage of another, whether it be her husband or a stranger, does not make it her debt and chargeable upon her separate estate, nor is she liable therefor.

The statute law of the State of Maryland for the protection of the property of married women does not remove the common-law disabilities of the wife to contract debts. Such have been the decisions by the courts of New York in respect to their statute upon this subject, which is similar to that of Maryland. *Yale* v. *Dederer*, 18 N. Y. 265, 22 N. Y. 450; *Manhattan Brass Mfg. Co.* v. *Thompson*, 58 N. Y. 80.

THE CHANCELLOR.—The title of the statute 13 Eliz. chap. 5, is "An Acte agaynst Fraudulent Deedes, Gyftes, Alienations," etc. The preamble and § 1 of the Act are as follows:

"For the avoyding and abolysshing of faigned covenous and fraudulent Feoffmentes Gyftes Grauntes Alienations Conveyaunces Bondes Suites Judgementes and Executions, aswell of Landes and Tenementes as of Goodes and Catals, more commonly used and practysed in these dayes, then hathe ben seene or hard of heretofore; W^{ch} Feoffmentes Gyftes Grauntes Alienations Conveyaunces Bondes Suites Judgementes and Executions have ben and are devysed and contryved of Malyce Fraude Covyne Collusion or Guyle, to Thend Purpose and Intent to delaye hynder or defraude Creditors and others of theyr juste and lawfull Actions Suites

Debtes Accomptes Damages Penalties Forfaitures Heriotes
Mortuaries and Releefes, not onely to the let or hindraunce
of the due Course and Execution of Lawe and Justyce, but
also to the overthrowe of all true and playne dealyng bar-
ganynge and chevysaunce betwene Man and Man, w$^{th}$out the
w$^{ch}$ no Common Welth or Civile Societie can be mayntayned
or contynued : Bee yt therefore declared ordeyned and
enacted by thaucthoritie of this present Parliament, That all
and every Feoffement Gyfte Graunte Alienation Bargayne
and Conveyaunce of Landes Tenementes Hereditam$^{t}$es Goodes
and Catalls or of any of them, or of any Lease Rent Comon
or other Pfyte or charge oute of the same Landes Tenem$^{t}$es
Hereditamentes Goodes and Catalls or any of them, by Wryt-
ing or otherwyse, And all and every Bonde Suite Judgm$^{t}$ and
Execution at any tyme, had or made sithens the begyninge of
the Queenes Ma$^{t}$es Raigne that nowe is or at any tyme here-
after to be had or made, to or for any Intent or Purpose
before declared and expressed, shalbe from henceforth deemed
and taken onely as againste that pson or psons his or theyre
Heyres Successors Executors Administrators and Assignes
and every of them, whose Actions Suites Debtes Accomptes
Damages Penalties Forfaitures Heriottes Mortuaries and
Reyleyfes, by such guylefull covenous or fraudulent Devyses
and Practyses as is aforesaid, are shall or mought be in any-
wyse dysturbed hyndred delayed or defrauded, to be clearely
and utterly voyde, frustrate and of none effecte ; Any Pre-
tence Color fayned Consideration expressing of use or any
other Matter or Thyng to the contrary notw$^{th}$standing."

The opinion of judges is uniform that this statute cannot
receive too liberal a construction, or be too much extended in
suppression of fraud. In *Twyne's Case* it was resolved that,
" because fraud and deceit abound in these days more than in
former times, all statutes made against fraud should be liber-
ally and beneficially expounded to suppress fraud." This
statute, it is believed, has been universally adopted in this
country,— it certainly has been in this State ; and I feel no
disposition, from a consideration of a more favorable aspect of

the times, to question the resolve in *Twyne's Case.* The statute, observes May, "is directed not only against such transfers of property as are made with the express intention of defrauding creditors, but extends as well to such as virtually and indirectly operate the same mischief by abusing their confidence, misleading their judgments, or secretly undermining their interests."

This statute makes void against creditors all manner of alienation of property, and also all bonds, suits, judgments, and executions, as well of lands and tenements as of goods and chattels had or made, or at any time thereafter to be had or made, to or for the intent or purpose to delay, hinder, or defraud creditors or others of their just and lawful actions, suits, debts, accounts, damages, etc. Its purposes and objects are as extensive as the Roman Civil Law, which declared "that all acts of whatever nature done by debtors to defraud their creditors should be revoked." Domat, Civ. L. bk. 2, tit. 1, § 1, ¶ 1.

If the bond executed by Jones to Edmund L. F. Hardcastle, trustee of Araminta Jones, was, in the language of the statute, devised of malice, fraud, covin, collusion, or guile, to the end, purpose, and intent to delay, hinder, or defraud creditors and others (under which term "others" these complainants, although not creditors at the time, but subsequently becoming such, would be included) of their just and lawful actions or suits, where actions or suits had been instituted, or of their debts, accounts, or damages, where actions or suits had not been instituted, whether such debts, accounts, or damages existed at the time of executing the bond, or were contracted, made, or existed subsequently, and at a period so near to the time of the execution of the bond, under circumstances sufficient to convince a rational mind that the purpose and intent of executing the bond was to delay, hinder, and to defraud creditors and others of their just and lawful actions, suits, debts, accounts, and damages,— then the execution of the bond was fraudulent, and the bond is void against all such, and the judgment confessed thereon, and the execution

issued on said judgment, are fraudulent, null, and void; and these complainants will, if such be the facts of this case, be entitled to a decree restraining the payment by the sheriff of the proceeds of the sale of the goods of Jones to the execution of Hardcastle, and for the payment of the same to themselves.

The execution of a bond, the consideration of which is voluntary, or rather where there is no consideration, or the consideration for which is natural love and affection, if made by a person in insolvent circumstances, or so indebted at the time as to justify a reasonable belief, founded upon a consideration of his pecuniary condition or estate, that its execution was not *bona fide*, and to place the *bona fides* of the transaction beyond reasonable question, would be, as against creditors at the time, fraudulent and void, and would, as against subsequent creditors, be void upon proof of the existence of a fraudulent intent in the execution of the bond; and such intent or purpose to defraud may be proved either directly or positively, or by a just inference drawn from the existence of facts and circumstances justifying a reasonable belief that the purpose and intent for which the bond was made was to defraud, hinder, or delay subsequent creditors in general, or any one or more subsequent creditors in particular. Whether the bond executed by Jones in favor of Hardcastle, and the judgment confessed to him, and the execution thereon issued, were such as to bring them within the just application of this principle, is the subject of inquiry in this suit.

There is no proof in this cause that, at the time of the execution and delivery of the bond by Jones to Hardcastle, there were any existing debts against Jones.

The case does not require, therefore, that I should consider the law as to the validity or invalidity, in respect to the rights of existing creditors, of the execution of a bond to a trustee, by a husband, in favor of his wife, where the bond is purely voluntary, or where its consideration is love and affection. The rule of law in reference to voluntary conveyances in respect to subsequent creditors is, in my opinion, correctly stated by Judge Story, and is this: " That there is nothing

inequitable or unjust in a man's making a voluntary convey-
ance or gift to his wife, or to a child, or even to a stranger, if
it is not at the time prejudicial to the rights of any other
persons, or in furtherance of any meditated design of future
fraud or injury to other persons; but if there is any design
of fraud or collusion, or intent to deceive third persons, in
such conveyances, although the party be not then indebted,
the conveyance will be held utterly void as to subsequent
creditors as well as to existing creditors, for it is not *bona
fide*." These rules, applicable to voluntary conveyances,
apply to bonds, judgments, and executions of goods and chat-
tels; they also being embraced in and made null and void by
the statute, 13 Eliz. chap. 5, where they have been devised
and contrived of malice, fraud, collusion, or guile, to the end,
purpose, or intent to delay, hinder, or defraud creditors or
others of their just and lawful suits, debts, accounts, and
damages.

In the case under consideration Jones made no convey-
ance to his wife, and none to her trustee for her. He did not
profess, in executing the bond, to be making a provision for
her by way of settlement, actual or contemplated. He made
thereby no settlement of property upon her or for her benefit,
either immediately or prospectively. He executed the bond
as the acknowledgment of indebtedness in the sum of $4,000.
If it cannot be supported against the complainants as an obli-
gation of indebtedness, it cannot be so supported by being
treated in the light of an intended settlement, nor can it be
supported as a voluntary obligation made in her favor by
means of the intervention of a trustee. It is true, there is no
evidence that Jones was indebted to other persons at the time
of the execution of the bond, but there is no proof that at
that time he was possessed of property of any kind to the
value of $4,000. He was engaged in selling goods, wares,
and merchandise in Dover, and had been so engaged a very
short time previous thereto. Within three months after the
date of the execution of the bond, he contracted the debt
with the complainants, for which they subsequently recovered

judgment against him, and, to compel payment of which out of the proceeds of the sale of his goods, they have instituted this suit. It also appears that about the same time, and subsequently thereto, he contracted debts with other persons, for the recovery of which suits had been brought and were pending when the judgment was confessed by him to Hardcastle. Although an intent in fact to defraud the complainants is not positively shown, yet, considering all the circumstances proved, and especially the very short period of time intervening between the execution of the bond and the creation of the debt with the complainants, the validity of the bond cannot be supported if it be considered of a purely voluntary character. Nor can it be considered as a valid intended settlement or provision for his wife; the circumstances (not of suspicion,—for mere suspicion would not be sufficient,—but of fact) furnishing, in my judgment, that degree of proof which only is required to satisfy a reasonable mind that, viewed in either of the characters mentioned, the execution of the bond, under the circumstances, would be sufficient evidence of a "meditated design" on the part of Jones to commit a future fraud; and such execution would not be *bona fide*, and would therefore be null and void against the complainants as subsequent creditors. A party executing a bond under such circumstances, for an amount far exceeding the value of all his property, and immediately thereafter purchasing large quantities of goods upon credit, would place himself in a condition to enable the obligee in the bond immediately to obtain judgment against him and to issue execution thereon, and thereby cause the goods so purchased upon credit to be sold for the payment of the amount acknowledged to be due on the judgment, thereby stripping himself of ability to pay for the goods so purchased when such payment ought to be made.

Such conduct would instinctively be adjudged fraudulent by any right-thinking mind, and a court of equity would not aid, but judge it by its true character. While courts of equity will favor a reasonable provision for wife or children, they

will declare such as are unreasonable and prejudicial as against existing creditors, and those which are fraudulent as against subsequent creditors, utterly null and void. In the case of *Coates* v. *Gerlach*, 44 Pa. 43, Strong, *J.* (now one of the justices of the Supreme Court of the United States), delivering the opinion of the court, says: " A court of equity will not enforce a voluntary conveyance if it be of more than a reasonable provision. A conveyance that denudes a husband of all or a greater part of his property is much more than a reasonable provision for a wife; for, in considering what is and what is not a reasonable provision, the circumstances of the husband are to be regarded,—his probable necessities, as well as his debts. Equity will not assist a wife to impoverish her husband. Accordingly it has always been held that a conveyance to a wife of all or the greater part of the husband's estate is an unreasonable provision, which, if voluntary, a court of equity will not sustain." It is stated in Fonblanque's Equity, bk. 1, chap. 4, § 12, note *a*, that " if a conveyance be of the whole or the greater part of a grantor's property, such conveyance or gift would be fraudulent; for no man can voluntarily devest himself of all or the most of what he has without being aware that future creditors will probably suffer by it." In 2 Story on Equity, § 1374, the learned commentator remarks: " If a husband should by deed grant all his estate or property to his wife, the deed would be held inoperative in equity, as it would be in law; for it could in no just sense be deemed a reasonable provision for her, which is all courts of equity hold the wife entitled to; and in giving her the whole he would surrender all his interest."

In a note to 1 Bishop on the Law of Married Women, § 751, taken from Bell, it is said: " No doubt, if the settlor be not indebted at the time of making the settlement further than most men must be, as already shown, and the settlement has been made without a view to the contraction of debt, it will be good against creditors in subsequently contracted debts, even although the settlement be in favor of strangers; but if the settlor, though not indebted at the time of making the

settlement, have contracted debts immediately or soon after, so as to collect from thence the intention to be fraudulent in order to defeat creditors, that will be sufficient to avoid the settlement; for it is not necessary that a man should be actually indebted at the time he enters into a voluntary settlement in order to make it fraudulent; if he enters into it with a view to be indebted at a future time, it is equally fraudulent."

As illustrating the application of the statute of 13 Elizabeth to subsequent creditors, the case of *Walker* v. *Burrows*, 1 Atk. 93, may be cited. It is there said by *Lord* Hardwicke that it is necessary on this statute to prove that, at the making of the settlement, the person conveying was indebted at the time or immediately after the execution of the deed. He also remarked: "Upon this statute there is no other description of the intent of the conveyance in the enacting clause but by reference only to the preamble, the intent before declared and expressed; so that, unless the conveyance in 1718 was made for that purpose, it will not be void. Now, here is no proof that the father was indebted at the time or soon after, so as to collect from thence the intention to be fraudulent." See also the case of *Stileman* v. *Ashdown*, 2 Atk. 480. In the case of *Gardiner* v. *Shannon*, 2 Sch. & Lef. 228, *Lord* Redesdale set aside a settlement as fraudulent against subsequent creditors, which had been made at a time when the settlor was not indebted more than £20, but when he was on the eve of entering into a partnership which soon after ended in a bankruptcy. His lordship remarks: "This is a mere voluntary bond,—an act which the bankrupt was not under an obligation to do; and when a man does such an act, it must be taken to have been done in order to deprive his creditors of the remedy they would otherwise have against his effects."

The rule deducible from all the cases, I think, is this: that where there is no actual fraud, or fraud in the intent in the origin of a voluntary conveyance, it is good against subsequent creditors; and that such actual fraud, or fraud in the intent, is an inference to be drawn from all the circumstances

surrounding the origin of the conveyance; and that the incurring debts immediately after the making of the conveyance, beyond the ability of the maker to pay, is sufficient evidence of a fraudulent intent as against subsequent creditors in making it, and renders it null and void. The same rule will apply to the making of a voluntary obligation for the payment of money. In fact, the reasons for declaring a voluntary bond, executed under such circumstances, void as against creditors, are, if possible, much stronger. In parting with his property under a voluntary conveyance, the maker surrenders only that of which he is possessed, and thus deprives himself of the means with which immediately to pay; while, by executing a voluntary bond for the payment of money, he not only exhausts his present means, but taxes his future earnings, and thereby renders payment in the future perhaps impossible.

The important and sole question, therefore, in this cause, is whether, at the time of the execution of the bond by Jones to Hardcastle, Jones was indebted either to his wife or to Hardcastle, as her trustee, or was legally or equitably bound to pay her or him, as her trustee, the sum of $4,000, —the consideration mentioned in the bond,—or so much thereof as will constitute a sufficient consideration for the same; and whether he, as her trustee, is therefore entitled to the proceeds of the sale of Jones's goods now in the hands of the sheriff and claimed by the complainants. The inquiry is an important one, not entirely free, perhaps, from difficulty,— important not so much in respect to the amount of money involved in the suit, as to the questions, legal and equitable, which require examination and decision. This, I believe, in one of its aspects,— the last which I shall notice,—is a case of first impression in the tribunals of this State. It will therefore justify a cautious and careful examination of the authorities applicable to it.

The doctrine in respect to the relation of husband and wife as debtor and creditor has been correctly stated by the Court of Appeals of the State of Maryland. In the case of *Edelen* v. *Edelen*, 11 Md. 415, a widow sought to charge her deceased

husband's estate with a debt claimed to be due to her, upon the allegation that certain negro children, belonging to the husband in his lifetime, were maintained at the expense of the wife, or from the produce of her separate estate during the period of the marriage. The court, after referring to Roper, 220; 2 Bright, Hus. & W. 259; *Squire* v. *Dean*, 4 Bro. Ch. 326; and 2 Macq. 298,— showing under what circumstances the assets of a husband would not be subject to the demands of a wife,—says: " The cases cited rest on the express or implied consent of the wife to the use, by the husband, of her estate. Cases sometimes arise where the relation of debtor and creditor exist between husband and wife, growing out of the use or appropriation, by the husband, of the wife's separate estate ; but such cases, where the receipt and appropriation are with the wife's knowledge and acquiescence, are always founded on an agreement by the husband to repay the money or property so appropriated."

In the case of *Kuhn* v. *Stansfield*, 28 Md. 210, it is stated that Mrs. Somerville and her husband, in August, 1863, acknowledged, in writing, that they had received from her father $800 as an advancement with a view to a portion or settlement of his daughter. In March, 1866, nearly three years afterwards, the husband, being largely indebted, executed a bill of sale of his property to his wife. A few days afterwards the plaintiffs sued out attachments against him as an absconding debtor. The court says : " It is conceded that a contract may be entered into by a husband for the transfer of property to his wife for a *bona fide* consideration coming from her. It is equally well settled that the relation of debtor and creditor may exist, growing out of the appropriation, by the husband, of the wife's separate property ; but if received and appropriated with her knowledge and acquiescence, this court has said in such cases there must be an agreement by the husband to repay the money so appropriated. That it (the $800) was received with the knowledge and acquiescence of the wife admits of no doubt ; and, as to the agreement to repay, both papers are entirely silent. It

is neither expressed in the receipt nor alleged by way of consideration of the bill of sale. Upon such proof as this, or, in fact, in the absence of all proof, this court cannot infer that an agreement was made."

In the case of *Hill* v. *Hill*, 38 Md. 183, it appears that the real estate of a deceased husband had been sold under a decree for the payment of his debts. Among the claims filed was one by his widow, being an account charging for cash lent by her to her husband during coverture. The claim was disallowed by the orphans' court, and upon appeal the court of appeals says: "We think the decision of the orphans' court was correct, the evidence being, in our opinion, altogether insufficient to establish the claim. In order to establish the relation of debtor and creditor between a husband and wife, growing out of the use or appropriation, by the husband, of the wife's money, being her separate estate, where the receipt and appropriation are with her knowledge and acquiescence, there must be an agreement by the husband to repay the money. In such case an assumpsit is not implied, but an express promise or agreement to repay the money must be shown."

These cases are in accord with the uniform decisions on the same subject. The words "express promise or agreement" do not, however, mean a bargain in so many words, but the recognition of an understanding between parties. *Cantine* v. *Phillips*, 5 Harrington, 429.

I know of no case contravening the principle, long established, thus recognized by the highest court of the State of Maryland. It will be applicable to and must govern all similar cases.

It appears, by the evidence in this cause, that at the time Jones and wife executed the several notes to Todhunter and mortgaged her separate property for their payment, and also at the time they sold the property to Colladay, they resided in the city of Baltimore, where the property was situate.

By article 45 of the Code of that State:

"§ 1. The property, real and personal, belonging to a

woman at the time of her marriage, and all property which she may acquire or receive after her marriage, by purchase, gift, grant, devise, bequest, or in a course of distribution, shall be protected from the debts of the husband, and not in any way liable for the payment thereof, etc.

"§ 2. The property acquired or owned, according to the provisions of the preceding section, by a married woman, she shall hold for her separate use, with power of devising the same as fully as if she were a *feme sole;* or she may convey the same by a joint deed with her husband, etc.

"§ 3. It shall not be necessary for a married woman to have a trustee to secure to her the sole and separate use of her property; but if she desires it she may make a trustee by deed, her husband joining in the deed, or she may apply to a court of equity and have a trustee appointed, in which appointment the uses and trust for which the trustee holds the property shall be declared.

"§ 4. A married woman, having no trustee, may, by her next friend, sue in a court of law or equity in all cases for the recovery or security or protection of her property as fully as if she were a *feme sole.*"

"§ 11. Any married woman may convey her real or personal property, if her husband joins in the conveyance, whether the conveyance be absolute or by way of mortgage," etc.

The object of this article was not to remove the general disabilities of married women, but only those that relate to the holding, use, and conveyance of property in the mode prescribed by the Act. It confers no rights and removes no disabilities in reference to anything else. It gives her no right to contract in respect to anything else. Her disability to execute a promissory note or obligation for the payment of money, having no relation to the holding, use, or conveyance of the property mentioned in the Act, is not thereby removed.

The acts of Mrs. Jones while she resided with her husband in the State of Maryland, in respect to her property, so far as the statute law of Maryland exclusively applies to those

5 Del. Ch.      7

acts, must be construed in reference to such statute law; and
her ability to contract in respect to her property, and her dis-
ability to contract in other respects and for other purposes,
must be determined by the same law.   Some judges have
held that these statutes, commonly known as the "Married
Women's Acts," being in derogation of the common law, are
to be construed strictly.   *Brookings* v. *White*, 49 Me. 479–481;
*Edwards* v. *Stevens*, 3 Allen, 315.

In the case of *Diver* v. *Diver*, 56 Pa. 106–109, Strong,
*J.*, says, in respect to the Married Women's Act then exist-
ing in Pennsylvania: "It is a remedial statute, and we con-
strue it so as to suppress the mischief against which it was
aimed, but not as altering the common law any further than
is necessary to remove that mischief."

*Chief Justice* Thompson, of Pennsylvania, in speaking of
the same Act, expresses, in my opinion, the correct view in
respect to all similar Acts.   He says: "That Act is an
enabling and enlarging Act.   It is of the very nature of such
Acts that they are to be administered in the spirit of the
rights enlarged by them.   Such legislation implies an inten-
tion to reform or extend existing rights, and it cannot be that
it is the duty of the courts to render them as unavailing as
possible to the class intended to be benefited, by harsh and
unpractical views and rules."   I would add to the words of
*Chief Justice* Thompson that it is the duty of the courts
to render them (these Acts) availing to the class intended to
be benefited, by liberal and practical views and rules, in so
far as such views and rules are consistent with the purposes
and objects contemplated by their enactment.   It is not ne-
cessary, for the purposes of this case, to consider what words
are necessary to create a separate estate in a married woman.
If, from an examination of the instrument by which the
estate is created, the intention to give a sole or separate
enjoyment to the wife is discoverable, that will be sufficient.
That the house and premises in Baltimore, which Mrs. Jones
and her husband mortgaged to Todhunter, were her separate
estate, appears by an inspection of the deed for the same to

Lockwood, her trustee. When I use the words "separate estate," I mean the kind of estate that text-writers on equity jurisprudence, courts of equity, and equity decisions mean by them. Used in this sense they always have reference to an equitable estate held by somebody in trust for a married woman. 1 Bish. 795; *Todd's Appeal,* 24 Pa. 429. It is true that these words are sometimes — perhaps generally — used in the recent statutes passed for the benefit of married women, in which, in general terms, it is declared that all the property, real and personal, of which a married woman shall be seised or possessed at any time before and during coverture, shall be her sole and separate property. This, however, is an innovation, and the application of terms to estates foreign to their original and true meaning as understood in equitable tribunals. Equity, except when compelled by statute law, will recognize no legal estate in a married woman as her separate estate. Such estates created by statute may be designated as "statutory separate estates," as contradistinguished from those separate estates recognized and protected by courts of equity. Whatever confusion and difficulty may arise from this misapplication of terms will be owing to the action of those who alone have authority to create confusion and difficulty,—the legislators of the several States. I shall decide this case, however, not with any particular reference to what is meant by the words "separate use," in the Maryland Code, but upon those great principles of equity jurisprudence applicable to it, recognized alike by the tribunals of Maryland and Delaware, and wherever those principles are administered by courts of equity.

At common law a husband and his wife cannot contract with each other. Her disability in this respect results from the fact that she is supposed to be subject to his power. Being thus subject, she is considered as having no will of her own. She cannot make a valid contract with any other person. Should she attempt so to contract, that law would adjudge her act a nullity.

A different rule prevails in equity. Here, for some pur-

poses, she may contract with her husband. Equity recognizes her right to a separate estate,—an estate for her sole and separate use and enjoyment,—and this estate equity will protect even against her husband. It recognizes her right to charge her separate estate, to pledge it for her own benefit or for the benefit of her husband, to make some contracts in respect to it, to incur debts upon the faith of it, and will give effect to and enforce all such contracts, pledges, and debts, in the same manner and to the same extent as it would in respect to her property, contracts, and debts if she were a *feme sole*. She may act as agent of her husband, and he may act, in some cases, as her agent. Her ability to act in respect to her separate estate, and to contract in relation thereto, are the same as they would be were she an unmarried woman. Jones and his wife executed a mortgage of her separate estate for the payment of his debt. That it was his debt, and not hers, can admit of no doubt; for it appears from the answer,—which in this respect is responsive to the bill,—and from the proofs in the cause, that the money lent by Todhunter was received by Jones. The answer states that it was received by him for his own benefit and advantage. The answer is evidence of that fact, and conclusive, unless the contrary appears from other proofs in the cause. There is no proof that the money so received was applied in payment of the debts of Mrs. Jones, or in any manner for her benefit. There is no evidence that she ever received it from him. Such being the facts, the presumption is that the application of the money was to purposes of his own. The mortgage was satisfied out of the purchase money of the property paid by Colladay. Jones received the balance of the purchase money after the debt due upon the mortgage to Todhunter was deducted, upon a check drawn in his favor, for his wife, and indorsed by him as agent for her. Does the law presume that the money so received by Jones on these two several occasions was a gift by her to him, or is the burden of proof upon the complainants to establish the fact that it was such a gift? Whether these facts establish the relation of debtor and creditor, or

principal and surety, between Jones and his wife; and whether the payment of the mortgage and the receipt of the moneys by Jones, as herein stated, constitute a sufficient consideration for the bond executed by him to Hardcastle, trustee for his wife,—are the questions now to be decided.

As before remarked, these are questions of first impression in this State. Text-writers upon this subject substantially agree in respect to it, although their language in some respects differs.

"Where a wife's estate is mortgaged for the benefit of her husband, she has, if she survives, a right, after all his debts are paid, to stand as a creditor against his assets, unless at the time of the mortgage a settlement is made upon her; but evidence is admissible to show that the wife intended otherwise. The title of the wife to be exonerated is considered as precisely the same as that of the heir." 1 Madd. 585.

It is stated in Clancy on Married Women, 589, that " where the transaction is a mortgage by husband and wife of her real estate, with a view to pay his debts or to promote his interest, she will be considered in equity as a creditor for the money, and as entitled to have his personal assets applied in discharge of the amount; the court looking on him as the debtor, and on her land only as an additional security."

Macqueen, in his work on Husband and Wife, 181, 182, speaking of a widow's right to be exonerated out of her husband's assets, says: " This equity is put upon the principle that she is considered, when mortgaging her property for her husband's debt, to stand in the attitude of a surety; from whence it follows that she must be invested with the usual privileges of that character, the first of which is indemnity from the principal for whose benefit her security was interposed." He also states that creditors have no preference over her in the administration of her husband's assets.

In Roper on Husband and Wife, vol. 1, 143, where this subject is treated, it is said: " Since the money was borrowed for the husband upon his wife's estate, she will be considered in the nature of a surety, and entitled to have such estate exonerated out of his assets."

Chancellor Kent says: "A wife may also sell or mortgage her separate property for her husband's debts, and she may create a valid power in the mortgagee to sell in default of payment;" and he adds, in a note, "that, if the wife joins the husband in a mortgage of her estate for his benefit, the mortgage, as between the husband and wife, will be considered the debt of the husband, and after his death the wife, or her representatives, will be entitled to stand in the place of the mortgagee, and have the mortgage satisfied out of the husband's assets." 2 Kent, Com. 167.

Judge Story, upon this subject, says: "If a wife should unite with her husband to pledge her estate, or otherwise to raise a sum of money out of it to pay his debts or to answer his necessities, whatever might be the mode adopted to carry that purpose into effect, the transaction would, in equity, be treated according to the true intent of the parties. She would be deemed a creditor or a surety for him (if so originally understood between them) for the sum so paid; and she would be entitled to reimbursement out of his estate, and to the like privileges as belong to other creditors." 1 Story, Eq. § 1373.

Bishop, in his work on the Law of Married Women, vol. 1, § 604, says: "In like manner husband and wife may mortgage her lands to secure a debt of her husband. As between the two she occupies the position of surety for him."

These opinions of text-writers are fully supported by adjudged cases on this subject. I shall not attempt to refer to all these cases, but only to so many of them as may be necessary to show the origin, expansion, and development of the doctrine upon this subject, with a view to the application of that doctrine to the present case. The case which I shall first notice, and the one most generally cited in succeeding cases on this subject, is that of *Tate* v. *Austin*, 1 P. Wms. 264. The report of that case states that a husband, seised in right of his wife, borrowed £500 in order to supply his occasions, particularly to buy himself a commission in the army; and for the securing of this money he and his wife levied a fine

of the wife's inheritance, and raised a term of 500 years, which was limited to the person lending the £500, to be void upon the payment of the £500 and interest, with remainder to the use of the wife in fee; and in the deed the husband covenanted to pay the mortgage money. Afterward the husband made his will, by which he gave several charities, and died indebted by simple contract. Upon a bill brought to have this mortgage discharged out of her husband's personal estate, *Lord Chancellor* Cowper remarked: "This mortgage is the debt of the husband, which must be paid before legacies; and the wife, by consenting to charge her land with it, does not make it less his debt than it was before; the personal estate shall be liable to pay debts before legacies, though to a charity, for they are still but legacies; but all other debts of the husband shall be preferred to this; everything should be taken favorably for the wife, who, for supplying the husband's occasions, has agreed to charge her land with a debt of his. The fine and deed of uses by which the mortgage is created are but as one conveyance; so that these legacies (though for a charity) are to be left unpaid, since it appears there are not assets of the husband to pay both the mortgage and the legacies." This opinion of *Lord Chancellor* Cowper, so far as it decides that a debt contracted under similar circumstances is the debt of the husband and not of the wife, and is payable in favor of the wife out of the assets of the husband, has been followed in all subsequent decisions; but, in so far as it decides that all other debts of the husband shall be preferred to that of his wife, it has not been generally followed, and may in fact be said to be opposed to and overruled by the weight of authority on the same subject. It is true, *Lord* Thurlow said, in *Clinton* v. *Hooper*, 1 Ves. Jr. 186, that he considered the rule to be that the title of the wife "is precisely the same as that of an heir at law;" yet we have seen from the text-books already cited, and shall see from the subsequent decisions on the same subject, that the wife is regarded as surety of the husband, or in the nature of a surety for the debt, and is entitled to all the rights which belong to a surety. If this be so, she must be

entitled to the benefit of the securities as against her husband's estate, and to satisfaction of her debt according to its degree. *Lord Chancellor* Hardwicke, in *Parteriche* v. *Powlet,* 2 Atk. 384, says: "Suppose a husband has a mortgage upon his estate, and a wife joins with him in charging her own, if she survives him, though her estate is liable to the mortgage, yet in this court her estate shall be looked upon only as a pledge, and she is entitled to stand in the place of the mortgagee, and to be satisfied out of the husband's estate."

According to this view, in a case like that supposed by *Lord* Hardwicke, the wife, paying the debt of the husband, would be entitled to be subrogated to the rights of the mortgagee in the mortgage against her husband's land, and to payment out of her husband's land in preference to creditors in judgments suffered subsequently to the mortgage. I cannot therefore conceive it to be true that all other debts of the husband shall be preferred to hers, especially if that other remark of *Lord* Cowper be true, that "everything shall be taken favorably for the wife, who, for the supplying the husband's occasions, has agreed to charge her land with a debt of his." It is also said by *Lord* Hardwicke, in *Robinson* v. *Gee,* 1 Ves. Sr. 252: "It is a common case for a wife to join in a mortgage of her inheritance for a debt of her husband; after the husband's death she is entitled to have her real estate exonerated out of the personal and real assets of the husband, the court considering her estate only as a surety for his debt; and none of his creditors have a right to stand in place of the mortgagee, to come round on the wife's estate." According to this opinion she has the rights of a specialty creditor, and therefore it cannot be true that "all other debts of the husband shall be preferred to" hers. *Lord* Thurlow, in the case before cited from Atkyns, after stating that the title of the wife is precisely the same as that of an heir at law, assigns as a reason, "because in *Tate* v. *Austin,* 1 P. Wms. 264, and 2 Vern. 689, though not the question in the cause, and consequently not weighed upon argument, yet the court was very clear that the wife cannot insist upon being paid in preference to onerous cred-

itors." He adds, however : "All the cases therefore concur to this : that where the debt is originally the debt of the husband, his personal estate is bound to pay it in the first instance ; and the wife will be entitled to be exonerated, not upon any right arising out of the contract, but because it is the debt of the husband, and his personal estate is the primary fund." In Mr. Hovenden's note to the same case it is said : "This case (in accordance with the authorities of *Parteriche* v. *Powlet*, and *Tate* v. *Austin*, therein cited) seems conclusively to establish that if a wife charge her separate estate for her husband's debt, or to raise money for his use, and a settlement upon herself forms no part of the same transaction, but it is merely (in whatever shape) a loan from the wife to her husband, then she will be a creditor as against his estate for any sum she may be called upon to pay in respect of that engagement."

If, then, according to these decisions, the wife in such a case be a creditor of her husband, how can it be said that all other debts of the husband shall be preferred to hers ? But this remark of *Lord Chancellor* Cowper in *Tate* v. *Austin*, that all other debts of the husband shall be preferred to that of the wife, has not met the approval of the judicial mind in other cases. *Mr. Justice* Nelson,—then of the Court of Errors of the State of New York, and late of the Supreme Court of the United States,—in the case of *Gahn* v. *Niemcewicz*, 11 Wend. 312, says : " The examination of the authorities have led me to concur with the court below on the point of suretyship, and I am unable to discover any satisfactory reason, upon principle, for distinguishing between the rights of the wife in this respect and those of any other person. . . . It is her separate estate to all intents and purposes, beyond the reach of her husband, his creditors, or anyone claiming under him, as much so as if she was a stranger. If, then, she pledges this estate for the security of his debts, why should she not be viewed, in respect to it, in the light of a surety, as much so as if she had pledged it for a stranger. It seems to me, to subject this property (which the law has thus distinctly sep-

arated from that of the husband) in the same way as if she was a principal debtor, except as to heirs and legatees,—which is the doctrine of *Tate* v. *Austin*, 1 P. Wms. 264, 2 Vern. 689,— would be not only a manifest departure from the expectation and intention of the parties, but a violation of principles settled and in daily application to like cases." Again, he says: "The late case of *Aguilar* v. *Aguilar*, 5 Madd. 414, decided by *Sir* John Leach, is opposed to the case of *Tate* v. *Austin*, decided by *Lord* Cowper." In the case of *Neimcewicz* v. *Gahn*, 3 Paige, 647, *Chancellor* Walworth says: "This questionable point in *Tate* v. *Austin* does not appear to have been followed in any more recent decisions. On the contrary it stands opposed in principle to the late decision of *Sir* John Leach in *Aguilar* v. *Aguilar*. . . . From the very nature of suretyship,—whether the personal responsibility of the surety or his property only is pledged for the debt of another,—if the surety is compelled to pay the debt, either to save his property or to discharge his personal obligation, he has an equitable claim to be subrogated to all the rights which the creditor had against the principal debtor or his estate. And as the decision in *Tate* v. *Austin* stands opposed, not only to this fundamental principle in the law of suretyship, but also to the deliberate and reiterated opinion of one of the most distinguished equity lawyers which Great Britain or any other country ever produced, I think it should be considered as a hasty decision, made without due consideration of the question decided, and that it ought not to be followed."

The principle that the wife, by joining with the husband in the mortgage of her separate estate for the payment of his debt, where the money raised upon the mortgage is appropriated for his benefit, thereby becomes a surety, and that the relation of debtor and creditor is thereby established between them, is also supported by the cases of *Lewis* v. *Nangle*, 1 Amb. 150 ; *Huntington* v. *Huntington*, 2 Vern. 437 ; and *Pocock* v. *Lee*, Id. 604.

In the case of *Aguilar* v. *Aguilar*, 5 Madd. 414, it appears that the plaintiff, who was the wife of the defendant,

having property to her separate use, joined her husband in a grant of an annuity, and the grant comprised as well the separate property of the wife as property given to the wife for life, not to her separate use, and to which, therefore, her husband was entitled *jure mariti.* The wife joined with the husband in granting other securities which were charged upon her separate property alone. The husband afterward took the benefit of an insolvent debtor's Act; and, his debts being considered of small amount, he subsequently granted two annuities charged on the wife's life interest, to which he was entitled *jure mariti.* The vice-chancellor decided that the wife, being a surety only in the grant of the annuity, which comprised her husband's property, as between her and her husband, and the assignee under the Insolvent Debtor's Act, and the subsequent annuitants, was entitled to have the husband's income first applied in satisfaction of the annuity.

In the case of *Gleaves* v. *Paine,* 1 De G. J. & S. 87, decided in 1863, *Lord Chancellor* Westbury says: " The estate of the wife being mortgaged in the manner I have described, for the debt of the husband, the wife unquestionably assumes, in the eye of a court of equity, the character of a surety for the husband. Properly speaking she is not a surety, but she is so called by way of analogy. She has a title to call upon the husband to exonerate her estate from the debt; but, the husband having become bankrupt, that exoneration is nothing more than a right, after she has paid the debt, to go in as a creditor upon the husband's estate in bankruptcy, and there, together with his other creditors, to receive such dividend as she may be able in respect of this debt which she has so paid."

The American decisions upon this subject fully sustain the doctrine of the English cases.

In the case of *Miner* v. *Graham,* 24 Pa. 495, Lewis, *Ch. J.,* says: " It is true that where a wife joins with her husband in granting a mortgage upon her estate for the debt of her husband, she stands as a surety."

In the case in 3 Paige, 614, before referred to, it was

decided that where a wife unites with her husband in a mortgage of her real estate for the payment of his debt, she is entitled to have his interest as tenant by the curtesy first sold and applied to the payment of the debt, in exoneration of her estate or interest in the mortgaged premises; and that this equity is paramount to the claim of a judgment creditor who has only a general lien upon the husband's interest in the premises subsequent to the mortgage. It was also decided in that case that if the fact that the wife executed the mortgage as the surety of her husband merely does not appear upon the face of the instrument, it may be established by parol proof; and that where a wife becomes a surety for her husband by the creation of a valid lien upon her own property or estate, she is entitled to the same equitable rights as other sureties.

Lewis, *J.*, in the case of *Sheidle* v. *Weishlee*, 16 Pa. 137, decided that when a wife joined her husband in a mortgage to secure the debt of her husband, she became entitled to all the rights of a surety as against her husband; that she had a right to insist on the sale of his own house and lot, included in the same mortgage, to pay his own debt, before resorting to her property; and that in case she was compelled to pay the debt, or any part of it, she was entitled to subrogation *pro tanto*, and had a right to enforce the mortgage against her husband's house and lot."

In the case of *Fitch* v. *Cotheal*, 2 Sandf. Ch. 29, it was decided by the assistant vice-chancellor of New York " that where a wife, seised of lands, joined her husband in executing three several mortgages to secure his bonds for money lent, the husband was the principal debtor, and that his wife's lands stood in the relation of a surety for his debt."

This case is very similar, in some of its facts, to the one under consideration. The vice-chancellor, in announcing his decision, remarks: " This evidence leads me irresistibly to the conclusion that Webster's (the husband's) note was made for the purpose of raising money to procure these mortgages for his benefit; that they were transferred the better to subserve that purpose."

Opinion; mortgaging wife's estate for husband.

In the case of *Loomer* v. *Wheelright*, 3 Sandf. Ch. 135, where a husband and wife joined in executing two mortgages accompanying his two bonds, all being given for the same debt, which was in part a pre-existing debt of the husband, and in part money advanced to him at the time, and one mortgage was on his own lands, and the other was on the wife's inheritance, it was held: (1) that the husband's lands were the primary fund for the payment of the mortgages, and the wife's became the secondary or auxiliary fund for that purpose; she became the surety for her husband in respect of the latter; (2) that the suretyship is made out in such a case by showing that it was the husband's debt, or that he received the money advanced. If the money was used for the benefit of the wife or her property, or any circumstances exist which will defeat her claim to be regarded as a surety, it must be proved by the party alleging such fact. In deciding the case the vice-chancellor remarked: " The complainant's first position is that, on the execution of the mortgages in 1837, Otis Loomer's property mortgaged became the primary fund for the payment of the debt, and his wife's inheritance became the secondary or auxiliary fund for that purpose. I entertain no doubt of the correctness of this point, and must hold that Mrs. Loomer, in respect of her property mortgaged, became the surety for her husband, and that the creditor knew that she was such surety. It was urged against this conclusion that the inference from the facts proved is that the wife intended to make a gift to her husband, or that the money was applied for the benefit of her estate. I cannot assent to this inference. The proof shows that the debt was the husband's, and nearly all of it was due from him to the mortgagees previous to the execution of the mortgages. He mortgaged his own property in one mortgage, and his wife joined him in another which conveyed her property. . . . I see no reason why a different rule should be applied to the wife's case from that which is applied in other instances of principal and surety. If I mortgage my farm to secure my friend's bond debt, and the creditor knows it is my farm, I become a surety for my friend,

and the creditor is bound to respect that relationship. The law indulges him in no conjecture that I intend to make a gift to my friend, or that the debt was incurred in some way for the benefit of my property. Why should such a conjecture or presumption be applied to a wife, in order to discharge her claim as a surety? If there should be any different rule, it ought rather to provide an inference in her favor than to strain a point against her. . . . The sensible rule in my view is, that the suretyship is made out by facts like those shown here, and if in truth the money went to improve the wife's freehold, or any other circumstance exists which will defeat her claim to be regarded as a surety, it must be proved by the party alleging such circumstance."

My full concurrence in the views thus expressed by the vice-chancellor of New York has induced me to quote thus largely from his opinion.

We have seen that the receipt and appropriation, by a husband, of money constituting the separate estate of his wife, with her knowledge and acquiescence, does not establish the relation of debtor and creditor between them, and entitle the wife to compensation out of the husband's assets, unless at the time of such receipt there was an understanding between them that he should repay the money so received and appropriated; and that, in the absence of such an understanding, the law presumes the money to be a gift by the wife to the husband.

When, however, a wife joins with her husband in mortgaging her separate estate for the payment of his debt, no presumption does or can arise from that fact that she at the time intends that, in case she is compelled to pay, or does pay, the amount of the mortgage out of her separate estate so mortgaged, she shall not be reimbursed by her husband. By becoming surety, or pledging her separate estate for the payment of her husband's debt, she gives him nothing. She only makes her separate estate subject to the payment of his debt in case he makes default in its payment. Presumption does not fix her liability nor determine her rights. The relation

between her and her husband, growing out of the transaction, the law determines to be in the nature of principal and surety ; and if the debt secured to be paid by the mortgage is paid out of her separate estate, that relation is changed by the law into that of debtor and creditor. Her rights as a surety or as a creditor are the same as would be those of any other person who is either surety or creditor in like circumstances, and the law does not presume anything against those rights.

Upon a full consideration of the facts in this case, and the legal and equitable principles applicable to it, I am of opinion that the debt, for the payment of which the mortgage was executed by Jones and his wife of her separate estate, was his debt, and not hers ; and that in executing the mortgage she only pledged her estate as a security for the payment of the debt, and that the relation which she thereby and therein assumed was in the nature of a surety, and not of a principal debtor, and that that relation conferred upon her all the rights and privileges of a surety ; that when the amount due on the mortgage was paid out of the purchase money of the house and premises sold to Colladay, that payment created the relation of debtor and creditor between Mr. and Mrs. Jones, and that by reason thereof he became bound to pay to her the amount so paid upon the mortgage ; that Jones, in receiving the balance of said purchase money on a check drawn in his favor for her, and indorsed by him as her agent (there being no proof that he afterwards paid it to her), thereby became indebted to her in the amount so received ; and that the bond executed by Jones to Hardcastle, her trustee, to secure the payment of the moneys so received by him, was not and is not fraudulent as against the complainants, but was executed for a consideration which in equity is sufficient and valid.

I therefore direct a decree to be drawn dissolving the injunction and dismissing the bill filed in this cause, with costs, upon the usual terms.